# EXHIBIT A

EXECUTION COPY

### E-Commerce Services Agreement

This E-Commerce Services Agreement (the "Agreement"), dated as of August 18, 2006 (the "**Effective Date**"), is made and entered into by and between GSI Commerce Solutions, Inc. ("**GSI**"), and BabyCenter, L.L.C. (the "**Company**").

### Recitals

WHEREAS, GSI is, among other things, in the business of providing order processing, order management, order fulfillment, customer service, and other related services in connection with e-commerce businesses;

WHEREAS, the Company is the owner and operator of the Company Online Store; and

WHEREAS, the Company and GSI desire to have GSI provide to the Company an order processing, order management, order fulfillment, and customer service solution for the Company Online Store as described herein during the Term of this Agreement;

WHEREAS, the Company and GSI entered into a Letter Agreement, dated July 28, 2006 in contemplation of this Agreement.

NOW, THEREFORE, in reliance upon the above recitals (which are made a part of the Agreement below) and in consideration of the agreements herein, the Company and GSI (each a "**Party**" and together, the "**Parties**"), intending to be legally bound, agree as follows:

**Section 1. Definitions.**

Whenever used in this Agreement, capitalized terms shall have the meanings set forth in Appendix "A" attached hereto.

**Section 2. Transition of the Company's Current Environment to New Environment; Required Data Integrations; Commencement of Services; Creation and Operation of the Company Online Store.** The Company and GSI will implement the transition of the Order processing, Order management, drop ship management, Order fulfillment and Customer service to GSI as contemplated under this Agreement and as otherwise agreed upon by the Parties. The Parties will work in good faith and use commercially reasonable efforts to complete such integrations and cause the Services Commencement Date to be on or before October 15, 2006, but in any event not later than November 1, 2006. GSI's obligations hereunder are subject to the Company's and its other service providers' reasonable cooperation with GSI in connection with such implementation and the Company and such service providers fully performing their respective obligations with respect to such implementation.

As between the Parties, the Company shall be solely responsible for the creation and operation of the Company Online Store, including the offer and sale of merchandise and services and all other services to the extent not specifically provided for herein.

**Section 3.**    **Order Processing, Inventory Management, Order Fulfillment, and Customer Service.**

3.1    **Order Processing; Drop Ship Management.**

(a)    GSI shall be responsible for processing Orders through GSI's authorization and processing company on a timely basis. Unless otherwise agreed upon by the Parties, required by applicable law or required by the applicable authorization and processing company, the purchase line of each Customer's billing statement will identify the seller of the purchased merchandise as "babycenter.com". GSI will be responsible for sending Customers automated Order and shipment confirmation emails as applicable. GSI shall submit the required processing information for an Order to the applicable credit card processing company within twenty-four (24) hours of shipment in order to charge the Customer credit card. GSI shall deliver to the Customer a shipping confirmation for Orders within twenty-four (24) hours of shipment. In the case of Orders shipped through drop ship vendors, the twenty-four hour periods noted above, begin upon such drop ship vendors notifying GSI that such Order has shipped.

(b)    GSI will maintain reasonable order review policies and procedures designed to detect and limit fraud in connection with Customer Orders. The Company acknowledges and agrees that such order review policies and procedures will be as selected by GSI, in its reasonable discretion. GSI will be responsible for all (i) processing fees (e.g. credit card processing fees), and (ii) Chargeback Costs related to fraudulent Orders to the extent GSI is performing such fraud review. For the sake of clarity, to the extent GSI is not responsible for performing fraud review, as between the Parties, the Company is responsible for chargebacks related thereto.

(c)    GSI will be responsible for managing Drop Ship Orders to be processed by applicable drop ship vendors, including data exchanges with such drop ship vendors in order to provide such drop ship vendors with required Order information, and to provide GSI and the Company with required Order confirmation, shipment confirmation and related information. The Parties will mutually agree upon the required processes related to entering into required agreements and service levels with drop ship vendors, issuing purchase orders to such drop ship vendors, receiving, reconciling and paying invoices received from such drop ship vendors and other applicable matters. GSI shall monitor and report on the compliance of such drop ship vendors with the agreed upon service levels. To the extent GSI pays such drop ship vendors on behalf of the Company, the Company shall pay to GSI as part of the transaction fees hereunder, all amounts due such drop ship vendors in connection with the fulfillment of merchandise hereunder, including the required cost of merchandise.

3.2    **Inventory Management.**

(a)    In order to facilitate appropriate inventory planning (including capacity, staffing, economic and other related factors), the Parties will work together in good faith to prepare mutually agreed upon merchandising assortment plans (each a "**Merchandise Assortment Plan**") for the Company Online Store at least ninety (90) days prior to the beginning of each calendar quarter (other than the first Merchandise Assortment Plan which will be prepared as soon as practicable prior to the Services Commencement Date). The Parties will work together to update each Merchandise Assortment Plan on a monthly basis both before and during the specific quarter covered by a particular Merchandise Assortment Plan, e.g. each Merchandise Assortment Plan will be updated five (5) times. Each Merchandise Assortment Plan will include the following, in reasonable detail, with respect to all Products: (a) the specific items to be included for sale on the Company Online Store and fulfilled by GSI (the "**Products**"), (b) sales projections and anticipated inventory turnover rates for each Product, (e) inventory availability and restrictions; (c) Model/Style #s for each product, (d) color and sizes for each Product (as applicable), (e) the quantities of each Product to be delivered to GSI, (f) a delivery schedule for the delivery of each Product to GSI, (g) packaging dimensions and weight by Product, and (h) other reasonably related information. The Parties acknowledge and agree that it is the intent of the Parties to maximizes revenue and to offer a broad and deep assortment of merchandise on the Company Online

Store to be fulfilled by GSI; provided, however, GSI will not, at its option, be obligated to accept into its fulfillment center any specific Product if logistical or operational parameters, such as weight or size characteristics of a Product, make it impracticable for it to be stored, processed or fulfilled). For the avoidance of doubt, GSI may not refuse to accept a specific Product into its fulfillment center for merchandise related reasons (e.g. based on product assortments of other customers attempting to create exclusive assortments).

(b)     GSI shall receive, unpack and store the Company's inventory which the Company delivers or causes to be delivered from time to time to GSI's designated facilities. The Company will deliver, or will cause to be delivered, to GSI, and GSI will accept, unpack and store, the Products to be fulfilled by GSI in such quantities and at such times as set forth in the Merchandise Assortment Plans or as otherwise may be mutually agreed upon by the Parties from time to time. The Company will deliver, or will cause to be delivered, such Products to GSI in a manner that minimizes GSI's receiving cost based upon GSI's receiving guidelines set forth on Exhibit A attached hereto and such other reasonable specifications as mutually agreed to by GSI and the Company from time to time. The inventory management services provided by GSI with respect to the Company Online Store will be provided in accordance with the service level standards set forth on Exhibit B attached hereto. If GSI receives any shipment of Products that was not included in the applicable, as updated, Merchandise Assortment Plan or if GSI receives any shipment of Products which was included in the applicable and as updated Merchandise Assortment Plan but for which the amount of Products actually received by GSI differs from the amount of Products reported via ASN as shipped, GSI will notify the Company of such shipment within two (2) Business Days after receipt of such Products and the Parties will adjust their records to reflect such difference. Additionally, GSI will notify the Company of any damaged or defective Products within two (2) Business Days of GSI discovering such damage or defect. The Company may inspect such delivered Products to verify any discrepancy in quantity and/or damage or defect. GSI will provide the Company with receiving documents for Products delivered to GSI on a timely basis and through a mutually agreed upon process. GSI will provide the Company with all reasonably requested information related to damaged or defective Products to permit the Company to file claims with respect to such Products. The Company shall instruct GSI how to disposition the defective Product, with the Company to cover the shipping return costs and any other disposal costs.

(c)     GSI will receive, profile and store the Products shipped to GSI as provided herein and in accordance with the service level standards set forth on Exhibit B attached hereto. GSI will provide fulfillment center space sufficient to accommodate the storage and maintenance of such Products in accordance with the Merchandise Assortment Plans. All title and risk of loss for all Products delivered to GSI, except as provided in Section 3.6, shall remain with the Company at all times. GSI will store Product in accordance with industry practice designed to safeguard the merchandise from loss or damage. GSI shall not transfer, assign, exchange, lease, encumber, pledge, create a security interest in, or otherwise encumber or subject any Product to attachment, levy, or seizure by or on behalf of any creditor of GSI.

(d)     The Company shall advise GSI in writing of any Product that, (i) is required to be shipped as hazardous materials ("Haz-Mat Shipments"), (ii) is required by the Company to be shipped with special shipping/handling requirements such as fragile ("Fragile Shipments"), (iii) is subject to restrictions regarding its sale and/or distribution, or (iv) is required to include any disclaimers, labeling or similar notices. For all Haz-Mat Shipments, the Company will pay to GSI $25 per person per hour for each hour spent in connection with the shipment of Haz-Mat Shipments plus all actual material costs for such shipments (e.g. special labeling materials, etc.). For all Fragile Shipments, the Company will pay to GSI $25 per person per hour for each hour spent in connection with the shipment of Fragile Shipments plus all actual material costs for such shipments (e.g. special packaging materials, etc.).

3.3     **Order Fulfillment.**

(a)     Each Order will include (a) the Customer's name, (b) the recipient's name, if different from the Customer's name, (c) the complete shipping address, which address must be a street

3

address and may not be a post office box or similar address, (d) the Customer's telephone number, (e) the Customer's email address, (f) all shipping instructions, (g) the SKU numbers, product descriptions and price to the customer for each SKU, and (h) other information reasonably requested by the Company. In accordance with the service level standards set forth on Exhibit B attached hereto, GSI will confirm to the Company GSI's receipt of such Order, which confirmation will state whether the Order was accepted or rejected. If an Order is rejected, the confirmation will set forth the basis for the rejection based upon GSI's standard reason codes.

(b)     As set forth in and subject to Section 8, GSI will be primarily responsible for all aspects of Order fulfillment for the Company Online Store, including all pick, pack and ship functions for Orders received through the Company Online Store. The fulfillment services provided by GSI with respect to the Company Online Store will be provided in accordance with the service level standards set forth on Exhibit B attached hereto. Except to the extent agree upon by the Parties, GSI will accept Orders for shipment only to addresses in the United States, Canada and APO/FPO addresses.

(c)     GSI will pack and ship orders for Products using GSI's standard outer packaging material and mutually agreed upon inner packaging. At the Company's request, GSI will use Company-branded packaging materials (e.g. boxes, tissue paper, labels) to pack and ship orders; provided that such materials are purchased by the Company and provided to GSI. Each order will include a packed with care card, packing slips, invoices and return labels branded with the Company's name, trademarks and/or logos. In accordance with service level standards set forth in Exhibit B attached hereto, GSI will provide the Company with a confirmation of shipping email to the customer, which shall include tracking information to the extent reasonably available to GSI.

(d)     GSI will make available to the Company gift packaging and other value added services that are mutually agreed upon by the Parties from time to time ("Value Added Services"). Certain Value Added Services available as of the Effective Date are listed on Exhibit C attached hereto. In consideration of GSI providing gift packaging, the Company will pay GSI a fee of $2.50 for each gift wrapped package and $1.50 for each gift wrapped box included in Orders shipped to Customers. In consideration of GSI providing Value Added Services other than gift packaging, the Company shall pay to GSI, the rates set forth on Exhibit C attached hereto.

(e)     Upon the reasonable request of the Company from time to time, GSI will include one or more marketing insertions (which insertions are prepared by and at the Company's cost) within every Product package shipped by GSI to a Customer hereunder or a particular subset of packages, unless a given package is not of sufficient size to accommodate such insertion. Unless otherwise agreed upon by the Parties, all subsets of packages shall be based upon the inclusion of particular Product in an Order (e.g. by assigning no-charge SKU numbers to insertions to be included with the purchase of particular Product). In consideration of providing such marketing services, the Company shall pay to GSI the amounts set forth on Exhibit D attached hereto.

3.4     **Returns.** The Company and GSI agree that the returns policy for the return of Products purchased through the Company Online Store shall be substantially similar to Exhibit E. GSI shall have no obligation with respect to any returns not returned directly to GSI as provided herein. The Company will not send any Products or other goods or services returned to the Company to GSI. The Parties acknowledge and agree that it is the intent of the Parties to minimize returns while also supporting fully the Company's brand proposition (i.e. providing customers with a policy that instills confidence in the Company's shopping experience).

3.5     **Company Forecasts.** Within ninety (90) days prior to the start of each year, the Company will provide GSI with a non-binding twelve month annual forecast for the upcoming calendar year, which forecast shall be updated on a monthly basis, providing reasonable requested information, including, weekly forecasts for the Company Online Store setting forth the Company's good faith estimates for (i) weekly sales Merchandise Revenue, (ii) weekly Order volume by number of Orders, (iii)

4

weekly percentage of Orders to be shipped on an expedited basis, (iv) weekly percentage of Orders which will require gift packaging or other Value Added Services, and (v) weekly Products returns percentage.

### 3.6 Inventory Inspections; Shrinkage.

(a) GSI will conduct no less than two (2) rolling cycle counts per calendar year of the Products located at GSI owned or controlled facilities. GSI may demonstrate compliance with the cycle count requirement via manual or automated controls. GSI agrees that all Products will be located at GSI owned or controlled facilities in Shepherdsville, Kentucky, unless otherwise agreed to by the Company. GSI will provide a detailed report reasonably acceptable to the Company of the results of such cycle counts. Additionally, the Company may, at is expense, and upon at least sixty (60) days prior written notice (but in no event between November 15 and January 31 of any year), conduct a full inventory inspection of the Products located at GSI owned or controlled facilities; provided that (i) any such inspection is conducted in a manner designed not to unreasonably interfere with GSI's ordinary business operations; and (ii) such inspections may not occur more frequently then one time every twelve (12) months. In addition, the Company may, from time to time, conduct spot checks, or request that GSI do so, with respect to inventory at no charge. GSI will reasonably cooperate with the Company in the performance of such inspections.

(b) Within sixty (60) days after the end of each of GSI's fiscal years, GSI shall determine the amount of Products, if any, for which GSI is responsible for but unable to account ("Shrinkage"). If the Shrinkage for any such year exceeds 0.5 % (calculated by dividing (i) the total cost of Products unaccounted for during the fiscal year in question, by (ii) the total cost of Products received by GSI during the fiscal year in question plus the total cost of Products on hand at the beginning of such fiscal year) (the "Shrink Allowance"), GSI will reimburse the Company for any shortage in excess of the Shrink Allowance in an amount equal to the Company's per unit Landed Cost for the applicable Products subject to such shortage. The Company shall provide GSI with the required Landed Cost information as necessary to perform such calculations. For the avoidance of doubt, the risk of loss of Product that has been received, unpacked and stored by GSI shall reside with GSI until delivered to a carrier for shipment to the Customer, and any loss of Product shall be accounted for under this Section 3.6(b) unless it results from the negligence or willful misconduct of the Company or the vendor or results from a defect in the Product in existence at the time of delivery to GSI.

### 3.7 Return of Unsold Merchandise.

(a) Upon no less than thirty (30) days prior written notice and not more than one time per calendar month (each an "Inventory Return Notice"), the Company may require that GSI return specified Products then in GSI's possession and control. For the avoidance of doubt, Product returned to vendors under Section 3.2(b) is separate and distinct from this Section 3.7. Each Inventory Return Notice shall specify in detail the specific Products that GSI is to return to the Company and shall designate the applicable location(s) to which such Products are to be sent. GSI will return such inventory "freight collect" to up to two (2) destinations designated by the Company; provided, however, all units of a particular SKU that are to be returned must be sent to a single destination. In the event that at anytime during the Term, the Company requires GSI to return to the Company any Products, then the Company shall pay to GSI $25 per person per hour for each hour spent in connection with the return of such Products.

(b) The Company agrees to use commercially reasonable efforts to remove slow-moving Products from GSI's fulfillment center. Notwithstanding any provision herein to the contrary, in the event that GSI retains any Products for more than 120 days, then, at GSI's option, GSI shall notify the Company in writing with respect to any such slow-moving Products, and (i) the Company will pay GSI a monthly storage fee (based upon Fiscal Months) equal to $.36 per cubic foot (or portion thereof) for Products stored commencing not sooner than thirty (30) days after such notice, or (ii) GSI will return such inventory "freight collect" to up to two (2) destinations designated by the Company such designations to be provided by the Company to GSI following the aforementioned written notice; provided, however, all

5

units of a particular SKU that are to be returned must be sent to a single destination. In the event that GSI returns any such Products, then the Company shall pay to GSI $25 per person per hour for each hour spent in connection with the return of Products. Additionally, upon the expiration or termination of this Agreement, GSI will promptly return to the Company all Products then in GSI's possession and control, pursuant to the same procedures and subject to the same fees as apply to the return of excess inventory in this Section 3.7(b); provided however in the event of termination for material breach by GSI, GSI shall return the Products to the Company without the $25 per person per hour fee.

3.8     **Customer Service.** GSI will be responsible for providing customer service to Customers for the services provided by GSI under this Agreement with respect to the Company Online Store 24 hours per day, 7-days per week basis, other than from 6:00 p.m. Eastern Time on December 24 to 8:00 a.m. Eastern Time on December 26. Such customer service will be provided in the name of the Company Online Store (unless otherwise required by law or the applicable privacy policy) and will be provided in accordance with the service level standards set forth on Exhibit B attached hereto. GSI will provide customer service in a courteous and professional manner and may provide for Customer service through, in addition to a toll-free telephone number and email response features, through interactive voice routing and message features. The Company will provide training to GSI's customer service representatives as reasonably requested by GSI or the Company with respect to the Company and the Products. If the Company desires to provide such training at a non-GSI owned or operated facility, the Company will reimburse GSI its reasonable travel and out-of-pocket expenses. In the event that the Company receives inquiries or complaints from Customers relating to the services provided by GSI under this Agreement with respect to the Company Online Store, the Company will promptly refer all such Customers to the toll-free telephone number and/or email address for customer service posted on the Company Online Store. The Company may maintain one or more toll-free telephone numbers and email addresses for customer service related matters, including those related to the services provided by GSI under this Agreement. The Parties shall cooperate to establish business rules with respect to the routing of Customer calls and emails, solutions, responses, and other Customer service matters prior to the Service Commencement Date. The Company will cause the Company Online Store to include in applicable section thereon, applicable industry standard self help features for Customer service to the extent requested and supported by GSI. GSI will keep complete and accurate records as recorded by the customer service representatives of the Customer service inquiries and resolution thereof in accordance with industry standards and shall make all such information available to the Company upon its reasonable request.

3.9     **Electronic Interchanges.** All applicable Product and other related information transmitted by and between GSI and the Company will be communicated electronically using mutually agreed upon electronic data interchange or to a file transfer protocol site designated by the receiving Party. To the extent the Parties mutually agree to use middleware in connection with any such communications, the Parties will utilize middleware acceptable to both parties. All costs incurred in the testing and transmission of such communications will be borne by the transmitting Party.

**Section 4. Compensation and Expenses.**

4.1     **Transaction Payments.**

(a)     In addition to the other amounts specifically provided herein, the Company shall pay to GSI (i) as a fulfillment fee, the sum of (A) an amount equal to seven and seven tenths percent (7.70%) of Merchandise Revenue received through the Company Online Store other than Drop Ship Orders, plus (B) an amount equal to two percent (2.0%) of Merchandise Revenue received through the Company Online Store for Drop Ship Orders (the "**Fulfillment Transaction Fee**"); (ii) as a technology fee, an amount equal to one percent (1%) of Merchandise Revenue received through the Company Online Store (the "**Technology Transaction Fee**"); (iii) as a Customer service and support service fee, an amount equal to two and seventy five one hundredths percent (2.75%) of Merchandise Revenue received through the Company Online Store (the "**Customer Service Transaction Fee**"); and (iv) as an Order processing fee,

6

an amount equal to two and eighty five one hundredths percent (2.85%) of Gross Revenue received through the Company Online Store (the "**Order Processing Transaction Fee**").

(b)    On a semi-annual basis in January and July, the Parties shall evaluate the average Customer contacts per Order for the preceding six month period. In the event the average Customer contacts per Order is less than 0.26 or greater than 0.4, then the Parties shall discuss in good faith and equitably adjust the percentage related to the Customer Service Transaction Fee to reflect the higher or lesser Customer contacts per Order, as the case may be.

(c)    Commencing on the Services Commencement Date, each Friday during the Term (or the following Business Day if Friday is not a Business Day), GSI will remit to the Company by wire transfer or by Automated Clearing House (ACH) transfer, as directed by the Company, an amount equal to eighty five percent (85%) of the Gross Revenue (net of returns processed by GSI), received into GSI's bank account from Customers for the preceding Sunday through Saturday (collectively, the amounts so transferred are the "**Transferred Amounts**"). Correspondingly, the amounts retained by GSI are the "**GSI Retained Amounts**".

(d)    Within thirty (30) days after the end of each Fiscal Month, GSI will provide the Company with a report (the "**Reconciliation Report**") setting forth the amounts due GSI with respect each of the Fulfillment Transaction Fee, the Technology Transaction Fee, the Customer Service Transaction Fee, and the Order Processing Transaction Fee (the "**GSI Transaction Fee Amount**") for such month. The GSI Transaction Fee Amount shall be net of the Fulfillment Transaction Fee Credits, Technology Transaction Fee Credits, and Customer Service Transaction Fee Credits, each of which shall be calculated in reasonable detail as described below and set off against their respective fees.

(e)    In addition, the Reconciliation Report shall detail (i) other amounts due GSI hereunder that become due in the applicable Fiscal Month, including but not limited to, fees related to Haz-Mat Shipments, Fragile Shipments, Value Added Services, marketing services, storage fees, implementation and development fees, packaging costs, and excess returns (the "**GSI Other Fee Amounts**") and (ii) other amounts due to the Company, including but not limited to, Chargeback Costs and shortage in excess of Shrink Allowance (the "**Company Reimbursed Amounts**").

(f)    In the event a Reconciliation Report demonstrates that the GSI Retained Amounts exceeds the GSI Transaction Fee Amount plus the GSI Other Fee Amounts minus the Company Reimbursed Amount for such month, then GSI will remit such difference to the Company along with such Reconciliation Report.

(g)    In the event such Reconciliation Report demonstrates that the GSI Retained Amounts is less than the GSI Transaction Fee Amount plus the GSI Other Fee Amounts minus the Company Reimbursed Amount for such month then GSI will, at its reasonable option, either (i) offset such difference against any amounts then payable or which become payable from GSI to the Company hereunder, or (ii) invoice the Company for such difference. The Company will pay any such invoice within forty-five (45) days of receipt. GSI shall provide the Reconciliation Reports in a format agreed to by the Parties reconciling, in reasonable detail, the components of the calculation of the applicable GSI Transaction Fee Amount, the GSI Other Fee Amounts and the Company Reimbursed Amounts. The Company acknowledges and agrees that all GSI Transaction Fee Amounts and GSI Other Fee Amounts shall be deemed earned by GSI on the date the applicable services are provided by or on behalf of GSI hereunder.

(h)    In the event that the reconciliations above result in material payments owed by either Party to the other Party, the Parties will work together in good faith to mutually agree upon an adjustment of the Transferred Amounts percentage not less frequently than on a quarterly basis in an effort to reduce and minimize such payments.

7

4.2    **Implementation and Development Fees.** The Company shall pay to GSI an amount equal to $125 per person per hour in connection with GSI's implementation and integration of the services hereunder; provided however that the amount payable shall not exceed GSI's estimate of $325,000. For the avoidance of doubt, GSI is obligated to complete such implementation and development activities as contemplated hereunder and absorb the costs with respect thereto in the event that the estimate is exceeded by more than the amount set forth above. GSI will invoice the Company for such amounts on a monthly basis with such invoice due forty five (45) days after receipt. GSI will provide the Company with reasonable detail of such time spent in connection with such invoice.

4.3    **Packaging Costs.** The Company shall pay to GSI an amount equal to GSI's actual packaging materials costs plus 15% for all packaging material used by GSI in connection with the services hereunder. GSI will invoice the Company for such amounts on a monthly basis with such invoice due forty five (45) days after receipt. GSI will provide the Company with reasonable detail of such costs in connection with such invoice.

4.4    **Excess Returns Fees.**

(a)    Within thirty days after the end of each GSI fiscal year during the Term, GSI shall calculate the Actual Returns Percentage (as defined below) for the Company Online Store for the preceding GSI fiscal year. In the event that the Actual Returns Percentage for the Company Online Store exceeds, on an aggregate basis, 6% for such period, then GSI shall calculate the Excess Returns Fee (as defined below) for the applicable period and the Company shall pay to GSI the Excess Returns Fee. The Excess Returns Fee to be paid by the Company hereunder shall be in addition to any amount paid or payable to GSI hereunder. GSI will invoice the Company for such amounts as provided in Section 4.1. GSI will provide the Company with reasonable detail of such fees in connection with such invoice.

(b)    <u>Definitions</u>.

(i)    **"Actual Returns Percentage"** means, for the year in question, the percentage obtained by dividing (A) the aggregate number of units returned to GSI's fulfillment center during that year (but expressly excluding any units returned as a result of GSI's failure to comply with the terms of this Agreement, including but not limited to shipment of the incorrect Product), by (B) the aggregate number of units shipped by GSI pursuant to Orders during that year.

(ii)    **"Excess Returns Fee"** means, for the year in question, the amount obtained by multiplying (A) $2.25, by (B) the number of units returned to GSI's fulfillment center in excess of 6% of the number of units shipped by GSI pursuant to Orders during that year.

4.5    **Shipping Costs.** GSI will use Company negotiated carrier rates with FedEx Corporation, United States Postal Service and United Parcel Service of America for shipment from the applicable GSI fulfillment center to the end Customer as reasonably directed by the Company. GSI will use commercially reasonable efforts to use applicable carriers designated by the Company based on weight and zone parameters among those carriers. All shipping and related costs from such carriers shall be billed to and paid directly by the Company. From time to time, GSI and the Company will discuss whether to ship Orders using GSI's shipping accounts for standard ground shipping as well as applicable expedited premium shipping options. If the Company elects to use GSI shipping accounts, the Parties shall amend this Agreement to reflect such costs and GSI's profit share with respect thereto.

4.6    **Drop Ship Integrations.** For integrations of drop ship vendors (i) after the Services Commencement Date, or (ii) in excess of eleven (11) prior to the Services Commencement Date, the Company will pay GSI for each such integration a fixed-fee amount equal to five thousand dollars ($5,000) per integration. Notwithstanding the foregoing, the integration fee in the preceding sentence will not apply for any drop ship vendor for which GSI then maintains the required integrations.

8

4.7    **Records and Audit Rights.** During the Term of this Agreement, and for a period of one (1) year thereafter, each Party will keep complete and accurate books and records sufficient to verify the accuracy of the payments required under this Agreement. Each Party will, upon at least sixty (60) days prior written request by the other Party, allow such Party, or a representative of such Party who is reasonably acceptable to the audited Party, to audit such books and records at the audited Party's premises, at the auditing Party's sole expense, to the extent necessary to verify the accuracy of the amounts owed and charged pursuant to this Agreement; provided that (a) any such audit is conducted during normal business hours and in a manner designed to not unreasonably interfere with the audited Party's ordinary business operations; (b) audits may not occur more frequently than once every twelve (12) months; (c) audits cannot occur during the months of January, April, July, October and/or December; and (d) each such audit may only cover the period commencing after the period covered by the last audit conducted pursuant to this Section 4.7, if any. The audited Party will cooperate with the auditing Party and its representatives in the conduct of such audit. If any audit reveals that the audited Party has failed to properly account for, charge and/or pay any amount hereunder which results in an overpayment by the auditing Party or an underpayment by the audited Party, then the audited Party will promptly pay the auditing Party any such amount, together with interest on the monies owed at an annual rate of two percent (2%) over the prime rate of interest reported in The Wall Street Journal from the date on which such overpayment was made or such overdue amount should have been paid to the auditing Party. Each Party agrees that any information learned by or disclosed to it or its auditor in connection with such audit is Confidential Information of the audited Party.

4.8    **Payment Method.** All payments due to the Company pursuant to this Agreement shall be made via wire transfer or ACH (as specified by the Company) of immediately available funds to an account designated in writing by Company. All payments due to GSI pursuant to this Agreement shall be made via wire transfer or ACH (as specified by GSI) of immediately available funds to an account designated in writing by GSI.

4.9    **Disputed Amounts.** Nothing set forth in this Agreement with respect to invoicing and payment or with respect to delivery and receipt of Reconciliation Reports shall be construed to limit the Company's right to contest in writing and in good faith the accuracy of any such invoice or Reconciliation Report in which event the Parties shall discuss in good faith to resolve any disputed matters and/or resolve in accordance with Section 10.10. Pending resolution of any such dispute, undisputed amounts shall be paid and/or remitted, as the case may be.

4.10    **SAS 70 Report.** Beginning with GSI's fiscal year 2007, GSI will, at its option, either: (i) provide the Company with a SAS 70 Type II Service Auditor's Report expressing an opinion that (a) GSI's description of its controls presents fairly, in all material respects, the relevant aspects of GSI's controls that had been placed in operation as of a specific date within twelve (12) months of the date such report is provided, and (b) that the controls were suitably designed to achieve specified control objectives; or (ii) reasonably cooperate with the Company to provide access and support necessary to enable the Company to satisfy, in form, content and timing reasonably acceptable to the Company, the Company's obligations under Section 404 of the Sarbanes-Oxley Act of 2002, as amended, and related laws, rules and regulations; provided that (a) the Company will bear its own costs incurred in connection with any such review of GSI's processes or internal controls, (b) GSI must be given reasonable notice of the requested access and/or support, and (c) GSI shall not be required to disclose to the Company any Confidential Information of GSI or the third parties for which GSI operates web sites.

**Section 5. Customer Information; Priority Rights.**

5.1    Each of the Company and GSI agrees that, as between the Company and GSI, the Company shall have the sole ownership interest in all Customer Information. GSI shall not use or disclose Customer Information other than in connection with the performance of its obligations hereunder. GSI agrees to treat all Customer Information as Confidential Information of the Company and each Party agrees to use all Customer Information in accordance with the privacy policy for the Company Online Store and all applicable laws, rules and regulations.

9

5.2    During the Term, the Company hereby grants to GSI a non-exclusive, non-transferable, royalty-free, license to use the Company Trademarks, Company Furnished Items, and other content and material provided or on behalf of the Company, solely as is reasonably necessary for GSI to perform its obligations under this Agreement. GSI agrees that, except as otherwise permitted hereunder, it will not sell, market, license, sublicense, copy, display, modify, translate, create derivative works based upon, or otherwise alter any of the Company Trademarks or other licensed content.

5.3    As between the Parties, GSI reserves all right, title and interest in and to the GSI Furnished Items, along with all Intellectual Property Rights associated with the GSI Furnished Items, and no right, title or ownership is transferred or licensed to the Company or any other Person. As between the Parties, all goodwill arising out of any use of the GSI Furnished Items by, through, or under the Company will inure solely to the benefit of GSI.

5.4    As between the Parties, the Company reserves all right, title and interest in and to the Company Furnished Items, along with all Intellectual Property Rights associated with the Company Furnished Items, and no right, title or ownership is transferred or, except as expressly provided in Section 5.2, licensed to GSI or any other Person. As between the Parties, all goodwill arising out of any use of the Company Furnished Items by, through, or under GSI will inure solely to the benefit of the Company.

## Section 6. Representations and Indemnification.

6.1    **Representations.** Each Party represents and warrants to the other that: (a) it has the full right, power and authority to enter into this Agreement and perform its obligations hereunder; (b) its execution, delivery and performance of this Agreement, and the other Party's exercise of such other Party's rights under this Agreement, will not conflict with or result in a breach or violation of any of the terms or provisions or constitute a default under any agreement by which it is bound; and (c) when executed and delivered, this Agreement will constitute its legal, valid and binding obligation enforceable against it in accordance with the terms of this Agreement.

6.2    **Indemnity.**

(a)    GSI will defend, indemnify and hold harmless the Company and its Affiliates (and their respective employees, officers, directors and representatives) from and against any and all claims, costs, losses, damages, judgments and expenses (including reasonable attorneys' fees) arising out of any third party claim, action, suit or proceeding (a "**Claim**"), to the extent it is based on (i) the services provided by GSI hereunder with respect to the Company Online Store, (ii) any actual or alleged breach of GSI's representations, warranties and/or obligations as set forth in this Agreement, (iii) the GSI-Furnished Items including any actual or alleged infringement of any Intellectual Property Rights, or (iv) any failure or alleged failure of GSI to comply with any applicable law, rule or regulation; in each case except to the extent caused by the breach of this Agreement or negligence or willful misconduct of the Company or its Affiliates.

(b)    The Company will defend, indemnify and hold harmless GSI and its Affiliates (and their respective employees, officers, directors and representatives) from and against any and all claims, costs, losses, damages, judgments and expenses (including reasonable attorneys' fees) arising out of any third party Claim, to the extent it is based on (i) the creation, operation or content of any Web Site operated by or on behalf of the Company, including the Company Online Store, (ii) any actual or alleged breach of the Company's representations, warranties and/or obligations as set forth in this Agreement, (iii) the Company Furnished Items, including any claims of actual or alleged infringement of any Intellectual Property Rights, (iv) the offer, marketing or sale of any products or services through the Company Online Store, including Claims based upon infringement, product liability, personal injury or death, or property damage or other loss or liability relating to any products or services sold by the Company, (v) the Products, including the design, construction, assembly, production, packaging, labeling, advertising, instructions and warnings or lack of any of the foregoing, (vi) any actual or alleged shipping

10

or other promise made to consumers related to the timing of delivery except as set forth in this Agreement or specifically agreed upon by GSI in writing, (vii) acts and/or omissions of the Company's other service providers related to the Company Online Store, (viii) any failure or alleged failure of the Company or its other services providers to comply with any applicable law, rule or regulation, or (ix) the agreements and transactions between the Company and its applicable common carriers (e.g. Fed Ex, USPS, UPS, etc.); in each case except to the extent caused by the breach of this Agreement or negligence or willful misconduct of GSI or its Affiliates.

6.3     Procedure. In case any claim, action, suit or proceeding is at any time brought against a Party or its Affiliates (or any of their respective employees, officers, directors or representatives) (an "Indemnified Party") and such Indemnified Party is entitled to indemnification pursuant to Section 6.2, the Indemnified Party will provide written notice of such Claim to the Party obligated to provide such indemnification (the "Indemnifying Party") promptly after receiving notice thereof, provided that the failure to provide such notice will not affect the obligations of the Indemnifying Party hereunder unless the Indemnifying Party is actually prejudiced by such failure. The Indemnifying Party will defend such claim, action, suit or proceeding, at the sole expense of the Indemnifying Party, using counsel selected by the Indemnifying Party. If the Indemnifying Party fails to take timely action to defend such a Claim or proceeding after having received written notice from the Indemnified Party of such failure, the Indemnified Party may defend such a Claim at the Indemnifying Party's expense. The Indemnifying Party will keep the Indemnified Party fully advised with respect to such Claims and the progress of any suits, and the Indemnified Party will have the right to participate, at the Indemnified Party's expense, in any suit instituted against it and to select attorneys to defend it, which attorneys will be independent of any attorneys chosen by the Indemnifying Party relating to such claim or related claim. The Indemnifying Party will not settle, compromise or otherwise enter into any agreement regarding the disposition of any claim against the Indemnified Party without the prior written consent and approval of the Indemnified Party, unless such settlement, compromise or disposition provides for monetary relief which is to be paid by the Indemnifying Party and a complete and unconditional release of the Indemnified Party.

### Section 7. Disclaimers and Limitations.

7.1     DISCLAIMER OF WARRANTIES. EXCEPT AS OTHERWISE PROVIDED IN THIS AGREEMENT, NEITHER PARTY MAKES, AND EACH PARTY HEREBY WAIVES AND DISCLAIMS, ANY REPRESENTATIONS OR WARRANTIES REGARDING THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT OR IMPLIED WARRANTIES ARISING OUT OF COURSE OF DEALING, COURSE OF PERFORMANCE OR USAGE OF TRADE.

7.2     LIMITATION OF DAMAGES. EXCEPT TO THE EXTENT AWARDED TO A THIRD PARTY IN A JUDGMENT AGAINST WHICH A PARTY IS ENTITLED TO INDEMNIFICATION PURSUANT TO SECTION 6 OR AS A RESULT OF AN INTENTIONAL BREACH, NEITHER PARTY WILL BE LIABLE (WHETHER IN CONTRACT, WARRANTY, TORT (INCLUDING, BUT NOT LIMITED TO, NEGLIGENCE), PRODUCT LIABILITY OR OTHER THEORY), TO THE OTHER PARTY OR ANY OTHER PERSON OR ENTITY FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL, PUNITIVE OR EXEMPLARY DAMAGES (INCLUDING DAMAGES FOR LOSS OF PROFIT, REPUTATION, BUSINESS OR DATA) ARISING OUT OF THIS AGREEMENT.

Section 8. Primary Provider. During the Term, GSI will be the primary provider of the Company's order processing, order fulfillment services and customer support services for the Company Online Store. GSI acknowledges and agrees that order processing, fulfillment and/or customer service with respect to certain items from the Company Online Store may occur with third parties such as, and not by way of limitation, a peer to peer marketplace, used product sales, affiliate relationships, and non-online channels, so long as such does not result in GSI not being the primary provider of the Company's order processing,

11

order fulfillment services and customer support services for the Company Online Store, as the case may be.

## Section 9.  Term and Termination.

9.1    Term.  Subject to the earlier termination rights of the Parties set forth herein, the initial term of this Agreement will commence on the Effective Date and will expire on the five (5) year anniversary of the Service Commencement Date (the "Initial Term"); provided however that the Agreement will automatically renew and the Initial Term will be extended for successive one year periods (together with the Initial Term, the "Term") unless either Party delivers written notice to the other Party not less than six (6) months prior to the completion of Initial Term or completion of any one year extension that the Agreement shall not renew for the upcoming one year period.

9.2    Termination for Breach.
9.2.1    Without limiting any other rights or remedies that either Party may have in law or otherwise, either Party may terminate this Agreement if the other Party fails to perform any of its obligations hereunder; provided that (a) the non-breaching Party sends written notice to the breaching Party describing in reasonable detail the breach and stating its intention to terminate this Agreement unless such breach is cured, and (b) the breaching Party does not cure the breach within sixty (60) days following its receipt of such notice.

9.2.2    Notwithstanding the foregoing, the Company shall further be entitled to terminate this Agreement in accordance with Exhibit B as described under the "Service Level Termination Event" bullet point.

9.3    Termination in the Event of Insolvency.  This Agreement may be terminated, prior to the expiration of its Term, upon fifteen (15) days written notice by either Party: (i) in the event that the other party hereto shall (1) apply for or consent to the appointment of, or the taking of possession by, a receiver, custodian, trustee or liquidator of itself or of all or a substantial part of its property, (2) make a general assignment for the benefit of its creditors, (3) commences a voluntary case under the United States Bankruptcy Code or other similar law, as now or hereafter in effect (the "Bankruptcy Code"), (4) files a petition seeking to take advantage of any law (the "Bankruptcy Laws") relating to bankruptcy, insolvency, reorganization, winding-up, or composition or readjustment of debts, (5) fails to controvert in a timely manner, or acquiesce in writing to, any petition filed against it in any involuntary case under the Bankruptcy Code, or (6) takes any corporate action for the purpose of effecting any of the foregoing; or (ii) if a proceeding or case shall be commenced against the other party hereto in any court of competent jurisdiction, seeking (1) its liquidation, reorganization, dissolution or winding-up, or the composition or readjustment of its debts, (2) the appointment of a trustee, receiver, custodian, liquidator or the like of the party or of all or any substantial part of its assets, or (3) similar relief under any Bankruptcy Laws, or an order, judgment or decree approving any of the foregoing shall be entered and continue unstayed for a period of 60 days; or an order for relief against the other party hereto shall be entered in an involuntary case under the Bankruptcy Code.

9.4    Effect of Termination.  Upon termination of this Agreement, each Party in receipt, possession or control of the other Party's intellectual or proprietary property, information and materials (including any Confidential Information) pursuant to this Agreement must return to the other Party (or at the other Party's written request, destroy) such property, information and materials. Sections 4 through 7, 9 and 10 (together with all other provisions that reasonably may be interpreted as surviving termination or expiration of this Agreement) will survive the termination or expiration of this Agreement. Notwithstanding the foregoing, termination of this Agreement will not relieve either Party from its obligation to pay any monies due to the other Party for any period prior to the effective date of termination.

9.5    Transition Services provided upon Termination or Expiration.

12

Upon the termination or expiration of this Agreement for any reason, a successor provider or providers may be retained to provide replacement services to the Company. GSI agrees to maintain the level and quality of services still being provided by GSI during the Term, and to cooperate, at the Company's expense, in an orderly and efficient transition to a successor provider as set forth below.

At Company's request, GSI shall continue to provide the services at the rates and charges and in accordance with the terms and conditions contained in the Agreement and provide additional transition services on mutually agreed upon rates and charges and terms and conditions, on a month-to-month basis for a period not to exceed six (6) months after the expiration or termination of the Agreement (the "Transition Period"). GSI will cooperate reasonably, at the Company's expense, in any transition to another provider at the end of the Term and during any Transition Period. Such cooperation shall include negotiating in good faith a plan with the Company and GSI's successor(s) that specifies the nature, extent and schedule of the phase-out of services and any costs and expenses related thereto (it being understood that such costs and expense would be for services incremental to the continued provision of services at the rates and charges and in accordance with the terms and conditions contained in the Agreement).

**Section 10. Miscellaneous.**

10.1    **Press Releases; Publicity.**  The Parties shall agree on an initial press release concerning the transactions contemplated by this Agreement. Thereafter, except as required by law, neither Party will make any public announcement or issue any materials in the nature of press releases, interviews or similar public relations events concerning this Agreement or the transactions contemplated hereunder without the prior written approval of the other Party. Neither Party will modify any such approved materials without the prior consent of the other Party as to such modification. Notwithstanding the foregoing, after the initial public announcement of a particular matter or transaction contemplated by this Agreement that has been approved by the Parties, either Party's subsequent reference to that particular matter or transaction, will not require another approval from the other Party; provided that such reference or use (i) remains factually accurate, (ii) is not misleading, and (iii) is made in the same context as the originally approved reference or use. It is the agreement of the Parties that the intention of the forgoing exception to consent is designed to permit a Party to make a limited number of disclosures of information previously disclosed in connection with such Party's quarterly and annual earnings announcements and similar releases and in connection with investor conference calls and presentations. Additionally, GSI may, without the Company's prior consent, include the Company and its logos and the Company Sites in lists of GSI clients so long as such inclusion is not given undue prominence (it being understood that GSI may not include in its lists the name, logos, or sites of the Company's Affiliates, including but not limited to Johnson & Johnson).

10.2    **Independent Contractors.**  The Parties are entering into this Agreement as independent contractors, and this Agreement will not be construed to create a partnership, joint venture or employment relationship between them. Neither Party will represent itself to be an employee or agent of the other or enter into any agreement or legally binding commitment or statement on the other's behalf of or in the other's name.

10.3    **Confidentiality.**

(a)    Each Party will protect the Confidential Information of the other Party from misappropriation and unauthorized use or disclosure, and at a minimum, will take precautions at least as great as those taken to protect its own confidential information of a similar nature. Without limiting the foregoing, the receiving Party and its Affiliates will: (i) use such Confidential Information solely for the purposes for which it has been disclosed; and (ii) disclose such Confidential Information only to those of its employees, agents, consultants, and others who have a need to know the same for the purpose of performing this Agreement. The receiving Party may also disclose Confidential Information of the disclosing Party to the extent necessary to comply with applicable law or legal process, provided that the receiving Party uses reasonable efforts to give the disclosing Party prompt advance notice thereof. Upon request of the other Party, or in any event upon any termination or expiration of the Term, each Party will

13

return to the other all materials, in any medium, which contain, embody, reflect or reference all or any part of any Confidential Information of the other Party; provided that each Party may retain segregated in its legal files an archival copy of the other Party's Confidential Information solely to monitor and ensure its compliance with this Section 10.3(a).

(b). Neither Party will disclose this Agreement or the transactions contemplated herein, or make any filing of this Agreement or other agreements relating to the transactions contemplated herein, without the consent of the other; provided, however, that if a Party is required by applicable law, rule or regulation of a governmental authority or self governing regulatory organization to provide public disclosure of this Agreement or the transactions contemplated herein, such Party will use all reasonable efforts to coordinate the disclosure with the other Party before making such disclosure, including the submission to the Securities and Exchange Commission (and any other applicable regulatory or judicial authority) of an application for confidential treatment of certain terms (which terms will be agreed upon by the Parties) of this Agreement. Each Party will provide to the other for review a copy of any proposed disclosure of this Agreement or its terms and any application for confidential treatment prior to the time any such disclosure or application is made and the parties will work together to mutually approve such disclosure or application.

10.4    **Force Majeure.** If either Party is unable to perform any of its obligations under this Agreement due to an event beyond the control of that Party, including natural disaster, acts of God, actions or decrees of governmental bodies, act of war, terrorism, failure or discontinuance of the Internet or failure of communications lines or networks, that Party will use commercially reasonable efforts to resume performance of its obligations but will have no liability to the other Party for failure to perform its obligations under this Agreement for so long as it is unable to do so as a result of such event.

10.5    **Notices.** Unless otherwise provided, all notices, consents or other communications required or permitted to be given under this Agreement must be in writing and will be deemed to have been duly given (a) when delivered personally, (b) three (3) Business Days after being mailed by first class mail, postage prepaid, or (c) one Business Day after being sent by a reputable overnight delivery service, postage or delivery charges prepaid, to the Parties at their respective addresses stated on the signature page of this Agreement. Notices may also be given by electronic mail or facsimile and will be effective on the date transmitted if confirmed within 24 hours thereafter by a signed original sent in the manner provided in the preceding sentence. Notices to GSI will be sent to its address stated on the signature page of this Agreement to the attention of the General Counsel, with a copy sent simultaneously to the same address to the attention of its Chief Financial Officer. Notices to the Company will be sent to its address stated on the signature page of this Agreement to the attention of the President, with a copy sent simultaneously to the Office of General Counsel, Johnson & Johnson, 1 Johnson & Johnson Plaza, New Brunswick, NJ 08933. Any Party may change its address for notice and the address to which copies must be sent by giving notice of the new addresses to the other Parties in accordance with this Section 10.5, except that any such change of address notice will not be effective unless and until received.

10.6    **Assignment.** Neither Party may assign this Agreement or any of its rights or obligations hereunder without the other Party's prior written consent. Subject to the foregoing, this Agreement will be binding on and enforceable by the Parties and their respective successors and permitted assigns. Notwithstanding the foregoing, either Party shall have the right to assign or transfer this Agreement (including, without limitation, rights and duties of performance), without consent of the other Party to any of its Affiliates or to a third party that is not an Affiliate in connection with a merger, consolidation, or sale or transfer of all or substantially all of its assets or business; provided however that the successor is capable of performing the obligations hereunder and agrees in writing to be bound by the terms and conditions of this Agreement.

10.7    **Amendment.** This Agreement may be amended, modified or supplemented by the Parties only in a writing signed by the Parties and expressly stating its intention to amend, modify or supplement this Agreement.

10.8    Waiver.  No waiver by a Party with respect to this Agreement will be effective or enforceable against a Party unless in writing and signed by that Party.  Except as otherwise expressly provided herein, no failure to exercise, delay in exercising, or single or partial exercise of any right, power or remedy by a Party, and no course of dealing between or among any of the Parties, will constitute a waiver of, or will preclude any other or further exercise of the same or any other right, power or remedy.

10.9    **Counterparts and Transmitted Copies.**  This Agreement may be executed in any number of counterparts, each of which when executed and delivered will be deemed an original, but all of which taken together will constitute but one and the same instrument, and it will not be necessary in making proof of this Agreement to produce or account for more than one original counterpart hereof.  The Parties acknowledge that copies which are reproduced or transmitted via facsimile, or another process of complete and which are accurate reproduction of this Agreement will be equivalent to original documents until such time (if any) as original documents are completely executed and delivered.

10.10    **Dispute Resolution.**  Any controversy or claim arising out of or relating to this Agreement shall be resolved by arbitration before a single arbitrator in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("AAA") then pertaining (available at www.adr.org), except where those rules conflict with this provision, in which case this provision controls. Any court with jurisdiction shall enforce this clause and enter judgment on any award. The arbitrator shall be selected within twenty business days from commencement of the arbitration from the AAA's National Roster of Arbitrators pursuant to agreement or through selection procedures administered by the AAA. Within 45 days of initiation of arbitration, the parties shall reach agreement upon and thereafter follow procedures, including limits on discovery, assuring that the arbitration will be concluded and the award rendered within no more than eight months from selection of the arbitrator or, failing agreement, procedures meeting such time limits will be designed by the AAA and adhered to by the parties. The arbitration shall be held in New York and the arbitrator shall apply the substantive law of New York, except that the interpretation and enforcement of this arbitration provision shall be governed by the Federal Arbitration Act.  In addition, the arbitrator shall be bound by the federal rules of evidence.  Prior to appointment of the arbitrator or thereafter if he is unavailable, emergency relief is available from any court to avoid irreparable harm.  THE ARBITRATOR SHALL NOT AWARD EITHER PARTY PUNITIVE, EXEMPLARY, MULTIPLIED OR CONSEQUENTIAL DAMAGES, OR ATTORNEYS FEES OR COSTS.

Prior to commencement of arbitration, the parties must attempt to mediate their dispute using a professional mediator from AAA, the CPR Institute for Dispute Resolution, or like organization selected by agreement or, absent agreement, through selection procedures administered by the AAA. Within a period of 45 days after the request for mediation, the parties agree to convene with the mediator, with business representatives present, for at least one session to attempt to resolve the matter. In no event will mediation delay commencement of the arbitration for more than 45 days absent agreement of the parties or interfere with the availability of emergency relief.

10.11    **Entire Agreement.**  This Agreement, together with the Exhibits, schedules and appendices, represents the entire understanding between the Parties with respect to the subject matter hereof and supersedes all previous oral or written communications or agreements, and all contemporaneous oral communications and agreements, between the Parties regarding such subject matter No breach of this Agreement by either Party will affect the rights or obligations of either Party under any other agreement between the Parties.

10.12    **Severability.**  If any provision of this Agreement is construed to be invalid, illegal or unenforceable, then the remaining provisions hereof will not be affected thereby and will be enforceable without regard thereto.

10.13   **CHOICE OF LAW.** THIS AGREEMENT WILL BE INTERPRETED, CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REFERENCE TO ITS CHOICE OF LAW RULES.

10.14   **Headings.**   The headings of sections and subsections of this Agreement are for convenience of reference only and are not intended to restrict, affect or otherwise influence the interpretation or construction of any provision of this Agreement.

10.15   **References.**   All words used in this Agreement will be construed to be of such number and gender as the context requires or permits.   Unless a particular context clearly provides otherwise (a) the words "hereof" and "hereunder" and similar references refer to this Agreement in its entirety and not to any specific section or subsection hereof, and (b) the word "including" will mean including but not limited to.

10.16   **Construction.**   The Parties agree that any rule of construction to the effect that ambiguities are to be resolved against the drafting Party will not be applied in the construction or interpretation of this Agreement or any other agreements or documents delivered in connection with the transactions contemplated by this Agreement.

**********************
(SIGNATURES APPEAR ON THE FOLLOWING PAGE)

16

IN WITNESS WHEREOF, intending to be legally bound, the Parties hereby execute this Agreement on the date first written above.

GSI COMMERCE SOLUTIONS, INC.

By: _____
Name: Vámon Pintzer
Title: E V P, Sales

| Address: | 935 First Avenue |
| | King of Prussia, PA 19406 |
| Telephone: | (610) 265-3229 |
| Facsimile: | (610) 265-1730 |

BABY CENTER, L.L.C.

By: _____
Name: Sarah Bernard
Title: VP, Store

| Address: | 163 Freelon Street |
| | San Francisco, CA 94107 |
| Telephone: | (415) 537-0900 |
| Facsimile: | (415) 537-0909 |

17

## Appendix "A"

### Defined Terms

"**Affiliate**" means, as to any Person, any other Person that, directly or indirectly, is controlled by, is under common control with or controls such Person, but only as long as such control exists. For this purpose, control means ownership or voting rights over at least 50% of the outstanding voting or equity securities of the Person in question or the power to direct or cause the direction of management or policies of such Person, whether through voting securities, by contract or otherwise.

"**Business Day**" means any day which is not a Saturday, Sunday or official federal holiday in the United States.

"**Chargeback Costs**" means (i) 67% of the amount charged to the Customer, and (ii) the Order Processing Transaction Fee with respect thereto. Upon the request of either Party, the foregoing % shall be evaluated to confirm that it achieves the objective of reimbursing the Company for its actual out-of-pocket costs for its lost Products and shipping costs with respect to the fraudulent Order and not more, and such percentage shall be adjusted upward or downward as necessary as a result of such evaluation.

"**Company-Furnished Items**" means the Company Online Store, the Company Trademarks, Technology and other content and material provided by the Company to GSI, that (a) are owned or controlled (e.g., by license or otherwise) by the Company or its Affiliates, as the case may be, and furnished by the Company or its Affiliates or its service providers for use in connection with the activities contemplated by this Agreement. As used herein, Company-Furnished Item will also include, without limitation, any adaptation, modification, improvement or derivative work of any Company-Furnished Item that is developed by either Party or jointly by the Parties; provided, however, that the Company-Furnished Items do not include any GSI-Furnished Item or any adaptation, modification, improvement or derivative work of GSI-Furnished Items that is developed by either Party or jointly by the Parties.

"**Company Online Store**" means the Web Site as operated by or on behalf of the Company, the primary Home Page for which is www.babycenter.com (and any successor or replacement Web Site).

"**Confidential Information**" means all nonpublic information relating to a Party or its Affiliates that is designated as confidential or that, given the nature of the information or the circumstances surrounding its disclosure, reasonably should be considered as confidential. Confidential Information includes, without limitation, (a) all nonpublic information relating to a Party's or its Affiliates' technology, customers, business plans, agreements, promotional and marketing activities, finances and other business affairs, and (b) all third party information that a Party or its Affiliates is obligated to keep confidential. Confidential Information may be contained in tangible materials, such as drawings, data, specifications, reports and computer programs, or may be in the nature of unwritten knowledge. Confidential Information does not include any information that (w) has become publicly available without breach of this Agreement, (x) can be shown by documentation to have been known to the receiving Party at the time of its receipt from the disclosing Party or its Affiliates, (y) is received from a third party who did not acquire or disclose such information by a wrongful or tortious act, or (z) can be shown by documentation to have been independently developed by the receiving Party without reference to any Confidential Information.

"**Customer**" means a Person who accesses the Company Online Store in any manner, whether or not an Order is placed.

"**Customer Information**" means the name, mailing address, telephone number, e-mail address, and any other personally identifying information provided by or obtained through the Company Online Store; provided, however, Customer Information does not include any information that either GSI or the Company owns or to which GSI or the Company has the rights and which is obtained from Customers other than through transactions contemplated under this Agreement.

"**Drop Ship Orders**" means Orders for merchandise through the Company Online Store to be fulfilled by applicable drop ship vendors.

"**Fiscal Month**" means each fiscal month in GSI's fiscal year.

"**Gross Revenue**" means all consideration (through any tender including the redemption of gift cards, gift certificates, bill-me-later or similar payment plans, paypal, g-buy, or similar payment options) received from Customers for Orders of merchandise and Value Added Services through the Company Online Store, and applicable shipping and handling charges and taxes, including amounts received from Customers which are subsequently credited to such Customers in connection with returns and chargebacks.

"**GSI Furnished Items**" means any and all Trademarks, Technology, content and information owned or controlled (e.g., by license or otherwise) by GSI or its Affiliates and furnished by GSI or its Affiliates to the Company or its other service providers in connection with the services hereunder or otherwise in connection with the performance of its obligations under this Agreement. GSI Furnished Items include any adaptation, modification, improvement or derivative work of any GSI Furnished Items that are developed by either Party, or jointly by the Parties; provided, however, that GSI Furnished Items do not include any Company Furnished Items.

"**Intellectual Property Rights**" means any and all now known or hereafter known tangible and intangible (a) rights associated with works of authorship throughout the universe, including copyrights, moral rights, and mask-works, (b) trademark, trade dress and trade name rights and similar rights, (c) trade secret rights, (d) patents, designs, algorithms and other industrial property rights, (e) all other intellectual and industrial property rights of every kind and nature throughout the universe and however designated (including domain names, logos, "rental" rights and rights to remuneration), whether arising by operation of law, contract, license, or otherwise, and (f) all registrations, initial applications, renewals, extensions, continuations, divisions or reissues hereof now or hereafter in force (including any rights in any of the foregoing).

"**Landed Cost**" means, with respect to each unit of Product, the Company's actual F.O.B. point of destination cost (i.e. cost to the Company's designated facilities) of such Product, plus in-coming freight, taxes and duties applicable to such unit, without mark-up, less applicable manufacturers' allowances, discounts, credits, rebates, reductions for non-conforming goods and similar deductions.

"**Merchandise Revenue**" means all consideration received from Customers for Orders of merchandise through the Company Online Store, including amounts received from Customers which are subsequently credited to such Customers in connection with returns (but excluding amounts associated with returns resulting from fulfillment errors by GSI which shall be deducted from such consideration), for which GSI provides fulfillment services, less the sum of the following deductions: sales, use, tariff, import/export duties or other excise taxes; chargebacks, transportation and handling charges and allowances.

"**Order**" means an order for Product made by a Customer through the Company Online Store, telephone and any other means.

"**Person**" means, whether or not capitalized, any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, or other entity or governmental body.

"**Services Commencement Date**" means the first date GSI actually ships Product in connection with fulfillment services under this Agreement (it being understood that GSI will start integration activity and receiving Product on an inventory basis to support the initiation of shipments prior to such date).

19

"**Technology**" means any design, specification, data, database, process, system, method of operation, concept, software, code, template, user interface, protocol, format, technique, algorithm, method, process, device, procedure, functionality or other technology or similar item.

"**Trademarks**" means any trademark, service mark, trade name, URL, domain name, trade dress, proprietary logo or insignia or other source or business identifier.

"**Term**" is defined in Section 9.1 of this Agreement.

## Exhibit "A"

### Receiving Guidelines

- The Company will provide GSI with advanced shipping notice information prior to delivery of Products to GSI, which shall include, at a minimum, the name of applicable carrier, carton counts / # of pieces, weight, purchase order reference numbers or other agreed upon identifier, waybill / pro / track #, ship date, ship from, ship to, model / style number, UPCs, descriptions, shipped quantity, and such other information reasonably requested by GSI from time to time.
- All shipments will have a visible packing slip with all required identifying information completed.
- A purchase order number will be displayed on the outside of each carton, preferably on the carton label.
- All shipments will have a completed bill of lading referencing the purchase order numbers contained within each shipment.
- Products shipped to GSI via less than truckload (LTL) (i.e. not via UPS or FedEx) must be palletized on standard pallets (48" x 40" 4-way pallets) and shrink-wrapped.
- All items will have all required identifying and descriptive information including a SKU specific UPC.

In the event that the Company (or a vendor on behalf of the Company) fails to comply with the above receiving guidelines, the Company, as the sole cost for failure to comply with the foregoing receiving guidelines, will pay to GSI $25 per person per hour for each hour that GSI reasonably spends addressing the Company's non-compliance with these receiving guidelines; provided however that the sole charge to the Company for failure to comply with a SKU specific UPC shall be a $0.05 per unit fee for GSI labeling such unit. GSI may modify rates upon no less than ninety (90) days notice to the Company; provided, however, rates may only be modified one time per calendar year during the Term and no individual increase may exceed 5%.

21

**Exhibit "B"**

**Minimum Service Level Standards**
**Operations**

**Section I: Inventory Management and Fulfillment Service Level Standards:**

Order Status:

GSI will provide at least 98% shipped order status back to the Company same Business Day of order shipment (tracked through missed order status file logs).

- If less than 98% of shipped order status back to the Company occurs on the same Business Day of order shipment, the Company will be issued one or more Fulfillment Transaction Fee Credits (as defined below) in accordance with the table set forth below. Such credit(s) to be determined on the basis of the actual percentage of order status files received the same Business Day of order shipments for such month as set forth in the table below.

| Actual percentage of order status files received the same day of order shipment for such month | Fulfillment Transaction Fee Credit(s) |
|---|---|
| 98.00%+ | 0% |
| 95.00% - 97.99% | 1% |
| *92.50% - 94.99% | 2% |
| *90.00% – 92.49% | 3% |
| *87.50% – 89.99% | 4% |
| *85.00% – 87.49% | 5% |
| *Below 85.00% | 10% |

Inventory Management:

- Subject to receiving at least one (1) Business Day prior notice of incoming shipments of inventory and subject to such shipments materially complying with the Merchandise Assortment Plan (which shall include forecasts related to amounts of products to be delivered to GSI and associated timing of such deliveries) then in effect and complying with the Receiving Guidelines set forth on Exhibit "A" ("Dock to Stock Eligible Inventory"), GSI will receive, unpack (to the extent necessary) and store ("dock to stock") 98% (calculated based upon Dock to Stock Eligible Inventory units received) of the Company provided inventory by the close of the 2nd Business Day after receipt of such inventory.

- If less than 98% of Dock to Stock Eligible Inventory received is not received, unpacked (to the extent necessary) and stored by the close of the 2nd Business Day after receipt of such inventory the Company will be issued one or more Fulfillment Transaction Fee Credits (as defined below) in accordance with the table set forth below. Such credit(s) to be determined on the basis of the actual percentage of Dock to Stock Eligible Inventory received, unpacked and stored by GSI by the close of the 2nd Business Day after receipt of such merchandise for such month as set forth in the table below.

| Actual percentage of Dock to Stock Eligible Inventory received, unpacked and stored by GSI by the close of the 2nd Business Day after receipt of such merchandise for such month | Fulfillment Transaction Fee Credit(s) |
|---|---|
| 98.00%+ | 0% |

| Actual percentage of Goods in Such Eligible Inventory received, unpacked and stored by GSI by the close of the 2nd Business Day after receipt of such merchandise for such Item | Fulfillment Transaction Fee Credit |
|---|---|
| 95.00% - 97.99% | 1% |
| 92.50% - 94.99% | 2% |
| 90.00% – 92.49% | 3% |
| 87.50% – 89.99% | 4% |
| 85.00% – 87.49% | 5% |
| *Below 85.00% | 10% |

Order Fulfillment:

- **Fulfillment Times for Standard Ship Orders:** At least 98% of all Fulfillable Orders (as defined below), excluding those that require customization or any other Value Added Service other than gift wrapping which is included, which require standard ground shipping, will be shipped within the next Business Day from the date an Order is received by GSI.

- If less than 98% of all Fulfillable Orders, excluding those that require customization or any other Value Added Service other than gift wrapping which is included, which require standard ground shipping, are shipped within the next Business Day from the date an Order is received by GSI, the Company will be issued one or more Fulfillment Transaction Fee Credits (as defined below) in accordance with the table set forth below. Such credit(s) to be determined on the basis of actual percentage of standard ship Orders shipped within the next Business Day from the date of receipt of Order by GSI within the applicable calendar month:

| Percent of applicable standard ship Fulfillable Orders in the applicable calendar month shipped within the next Business Day from the date of receipt by GSI | Fulfillment Transaction Fee Credit |
|---|---|
| 98.00%+ | 0 % |
| 95.00% - 97.99% | 1% |
| 92.50% - 94.99% | 2% |
| *90.00% – 92.49% | 3% |
| *87.50% – 89.99% | 4% |
| *85.00% – 87.49% | 5% |
| *Below 85.00% | 10% |

- **Fulfillment Times for non-Standard Ship Orders.** The service level percentages and Fulfillment Transaction Fee Credits for non-Standard Ship Orders, e.g. Orders subject to customization or other Value Added Services other than gift wrapping which shall not require one additional Business Day shall be the same as set forth above for standard ship Orders except that one additional Business Day will be added to the ship windows for such Orders.

- **Fulfillment Times for Expedited Ship Orders:** At least 98% of all Fulfillable Orders (as defined below), excluding those that require customization or any other Value Added Service other than gift wrapping which is included, which require expedited shipping, will be shipped within the same Business Day from the date an Order is received by GSI, so long as such Order becomes a Fulfillable Order prior to 3:00 p.m. EST on such Business Day.

- If less than 98% of all Fulfillable Orders, excluding those that require customization or any other Value Added Service other than gift wrapping which is included, which require expedited

23

shipping and which become a Fulfillable Order prior to 3:00 p.m. EST, are shipped within the same Business Day from the date an Order is received by GSI, the Company will be issued one or more Fulfillment Transaction Fee Credits (as defined below) in accordance with the table set forth below. Such credit(s) to be determined on the basis of actual percentage of expedited ship Orders shipped on the same Business Day from the date an Order is received by GSI with the applicable calendar month in accordance with the above:

| Percent of applicable expedited ship audit-ble Orders in the applicable calendar month shipped within the same Business Day from the date of receipt by GSI | Fulfillment Transaction Fee Credit |
|---|---|
| 98.00%+ | 0 % |
| 95.00% - 97.99% | 1% |
| *92.50% - 94.99% | 2% |
| *90.00% – 92.49% | 3% |
| *87.50% – 89.99% | 4% |
| *85.00% – 87.49% | 5% |
| *Below 85.00% | 10% |

Return Processing:

- At least 98% (measured in units returned) of all returned merchandise which comply with the Company's return policy and which are returned within sixty (60) days from the original shipment will be received, unpacked and stored ("Return to Stock Eligible Inventory") by GSI by the close of the 2nd Business Day after receipt of such returned merchandise.

- If less than 98% of Return to Stock Eligible Inventory received is not received, unpacked and stored by the close of the 2nd Business Day after receipt of such inventory, the Company will be issued one or more Fulfillment Transaction Fee Credits (as defined below) in accordance with the table set forth below. Such credit(s) to be determined on the basis of the actual percentage of Return to Stock Eligible Inventory received, unpacked and stored by GSI by the close of the 2nd Business Day after receipt of such returned merchandise for such calendar month as set forth in the table below.

| Actual percentage of Return to Stock Eligible Inventory received, unpacked and stored by GSI by the close of the 2nd Business Day after receipt of such merchandise for such month | Fulfillment Transaction Fee Credit |
|---|---|
| 98.00%+ | 0% |
| 95.00% - 97.99% | 1 % |
| 92.50% - 94.99% | 2 % |
| 90.00% – 92.49% | 3 % |
| 87.50% – 89.99% | 4 % |
| 85.00% – 87.49% | 5 % |
| *Below 85.00% | 10 % |

24

## Section II: Information Technology Operation Services Levels

Definitions. For purposes of this Exhibit "B", the following definitions shall apply:

1.  "**Information Technology Operation Services (ITOS)**" means the computer, software and network services operated and maintained by GSI necessary for GSI to receive, process and manipulate inventory and Order information necessary for GSI to perform its fulfillment services hereunder and to provide the required Order and shipping confirmations between the Company and GSI.

2.  "**Outage**" means any unplanned interruption in an ITOS operation which prohibits GSI from receiving and processing Orders or inventory or which prohibits GSI from providing Order fulfillment.

3.  "**Permitted Outage**" means planned maintenance interruption in an ITOS operation, such as periods during which GSI performs scheduled maintenance on hardware, software, including upgrades and updates. Additionally, in the event that GSI is able to provide a reasonable work around during any period that the ITOS operations are inoperable and which permits GSI to receive, process and manipulate inventory and Order information necessary for GSI to perform its fulfillment services hereunder and to provide the required Order and shipping confirmations between the Company and GSI, then the period that such work around is operational shall be deemed a "Permitted Outage" and shall not be deemed an "Outage".

4.  "**Total Scheduled Availability**" means 24 hours x 7 days per week, less Permitted Outages.

5.  "**Actual Uptime Percentage**" means the percentage of the number of hours the ITOS were operational and not subject to an Outage, divided by Total Scheduled Availability.

6.  "**Escalation Procedure**" means measures and guidelines designed to minimize business impact by timely resolution of failures in one or more of GSI services to the Company. The measures and guidelines should include procedures to account for and address incident triggers, communication levels, problem hand-off, and resolution time targets.

**During the Term, the Actual Uptime Percentage for each and all Information Technology Operation Services (ITOS) meet or exceed 99.25%**

*   If the Actual Uptime Percentage with respect to any calendar month is less than 99.25%, the Company will be issued one or more Technology Transaction Fee Credits (as defined below) in accordance with the table set forth below. Such credit(s) to be determined on the basis of the Actual Uptime Percentage for such month as set forth in the table below.

| Actual Uptime Percentage in the applicable calendar month | Technology Transaction Fee Credit(s) |
| --- | --- |
| 99.25%+ | 0% |
| 98.25% - 99.24% | 1% |
| 97.25% - 98.24% | 2% |
| 96.25% - 97.24% | 3% |
| *95.25% - 96.24% | 4% |
| *94.25% - 95.24% | 5% |
| *Below 94.25% | 10% |

25

**Outage Responsiveness:**

- GSI will accept reports of Outages, 24 hours a day, seven days a week via telephone or pager communication directly from up to two designated Company contacts. Telephone and facsimile numbers and e-mail addresses for the reporting of Outages by designated Company contacts shall be as provided by GSI in writing from time to time.

- GSI shall respond to and address Outages, and communicate with the Company, in accordance with GSI's standard problem escalation and response procedures. GSI will keep the Company reasonably apprised as to the status of such Outage and the proposed resolutions thereto. GSI will have a business management representative available at all times during the Term via telephone or pager in order to reasonably communicate with the Company in the event of an Outage. At the request of the Company, upon resolutions of any such Outage, GSI will reasonably review with the Company the cause of such Outage, the effect of such Outage on the services provided by GSI hereunder and the resolution of such Outage. Additionally, if the Actual Uptime Percentage is between 97.00% and 99.25% in any given month, GSI and the Company's Director of Operations will review and discuss the cause of such Outage, the effect of such Outage on the services provided by GSI hereunder and the resolution of such Outage and if the Actual Uptime Percentage is less than 97.00% in any given month, representatives from each Company (with the title of Vice President or above) review and discuss the cause of such Outage, the effect of such Outage on the services provided by GSI hereunder and the resolution of such Outage.

**Permitted Outage Timing:**
- GSI will use commercially reasonable efforts to perform standard maintenance between the hours of 2:00 a.m. and 6:00 a.m. EST and will not exceed 10% of the time during which scheduled maintenance is permitted to occur during each month). In the event that GSI intends to perform standard maintenance other than during such times, GSI will provide the Company with reasonable prior notice based upon the facts and circumstances giving rise for the need for such maintenance. Standard maintenance will be performed at times and in manners designed to minimize the impact on the services to be provided by GSI hereunder.

**Section III: Customer Service and Support Service Level Standards.**

- **Prompt Response During Non-Peak Months:** During Non-Peak Months, telephone calls will be answered within an average of 30 seconds or less, with answering times measured from the time a Customer selects an automated prompt to the time answered by GSI personnel.

- If telephone calls during any Non-Peak Month are not answered within an average of 30 seconds or less, the Company will be issued one or more Customer Service Transaction Fee Credits (as defined below) in accordance with the table set forth below. Such credit(s) to be determined on the basis of actual average time telephone calls are answered for such Non-Peak Month as set forth in the table below:

| Actual Average Time Telephone Calls are Answered in the applicable Non-Peak Month | Customer Service Transaction Fee Credit: |
|---|---|
| 30 seconds or less | 0 % |
| Between 30.1 seconds and 35.0 seconds | 1 % |
| Between 35.1 seconds and 40.0 seconds | 2 % |
| *Between 40.1 seconds and 45.0 seconds | 3 % |
| *Between 45.1 seconds and 50.0 seconds | 4 % |
| *Between 50.1 seconds and 55.0 seconds | 5 % |
| *More than 55.0 seconds | 10 % |

26

| Percentage of orders in the applicable Peak Month where GSI's 20 second or more and abandoned the callers due to GSI's inability to answer such telephone calls in a timely manner | Customer Service Transaction Fee Credit |
|---|---|
| 5.00% or less | 0 % |
| Between 5.01% and 5.50% | 1 % |
| Between 5.51% and 6.00% | 2 % |
| *Between 6.01% and 6.50% | 3 % |
| *Between 6.51% and 7.00% | 4 % |
| *Between 7.01% and 7.50% | 5 % |
| *More than 7.50% | 10 % |

- **Answered Emails During Non-Peak Months:**  At least 95% of emails received by GSI's customer service center during Non-Peak Months will be answered within twenty-four (24) hours of receipt.
- If less than 95% of emails received by GSI during Non-Peak Months are answered within 24 hours, the Company will be issued one or more Customer Service Transaction Fee Credits (as defined below) in accordance with the table set forth below.  Such credit(s) to be determined on the basis of the actual percentage of emails answered within 24 hours during the applicable calendar month as set forth in the table below.

| Percentage of emails that are answered for the applicable calendar month within 24 hours | Customer Service Transaction Fee Credit |
|---|---|
| 95.00%+ | 0 % |
| 92.50% - 94.99% | 1 % |
| 90.00% – 92.49% | 2 % |
| *87.50% – 89.99% | 3 % |
| *85.00% – 87.49% | 4 % |
| *82.50% - 84.99% | 5 % |
| *Less than 82.50% | 10 % |

- **Answered Emails During Peak Months:**  At least 95% of emails received by GSI's customer service center during Non-Peak Months will be answered within thirty-six (36) hours of receipt.
- If less than 95% of emails received by GSI during Peak Months are answered within 36 hours, the Company will be issued one or more Customer Service Transaction Fee Credits (as defined below) in accordance with the table set forth below.  Such credit(s) to be determined on the basis of the actual percentage of emails answered within 36 hours during the applicable calendar month as set forth in the table below.

| Percentage of emails that are answered for the applicable calendar month within 36 hours | Customer Service Transaction Fee Credit |
|---|---|
| 95.00%+ | 0 % |
| 92.50% - 94.99% | 1 % |
| 90.00% – 92.49% | 2 % |
| *87.50% – 89.99% | 3 % |
| *85.00% – 87.49% | 4 % |
| *82.50% - 84.99% | 5 % |
| *Less than 82.50% | 10 % |

**Section IV: Generally Applicable Provisions:**

- The above service level standards will be measured on a monthly basis during the Term.  The above Service Level standards shall not apply to any services other than those specified, and shall

28

not apply to service performance issues caused by factors outside of GSI's reasonable control, including as a result of any actions or inactions of the Company or any third party not within GSI's control. Additionally, the fulfillment service level standards shall not apply to Drop Ship Orders. In addition, during any weekly period that actual transaction volumes exceeds or fails to achieve the Company's transaction volume forecasts (as provided and updated in the month prior to the month being measured in accordance with Section 3.5 of the Agreement) by more than 10%, then such weekly period shall be excluded from the calculation of such service level standard.

- For purpose of this Agreement, "Non-Peak Months" mean all calendar months other than the calendar months of December and January. "Peak Months" mean December and January.

- For purposes of this Exhibit B, "Fulfillable Orders" means Orders received through the Company Online Store for which the applicable Products are confirmed to the Customer as available for shipment from a GSI fulfillment center which have cleared credit and fraud review and which are not rejected by GSI in accordance with Section 3.3(a), or rejected by the Customer or the Company for any reason.

- For purposes of this Agreement, a "Fulfillment Transaction Fee Credit" means the Fulfillment Transaction Fee Credit percentage amount set forth in Section I of this Exhibit for each applicable service level standard that was not achieved, multiplied by the dollar amount of the Fulfillment Transaction Fees under Section 4.1 payable in the applicable month for which the applicable service level standard applies. For purposes of this Agreement, a "Technology Transaction Fee Credit" means the Technology Transaction Fee Credit percentage amount set forth in Section II of this Exhibit for each applicable service level standard that was not achieved, multiplied by the dollar amount of the Technology Transaction Fees under Section 4.1 payable in the applicable month for which the applicable service level standard applies. For purposes of this Agreement, a "Customer Service Transaction Fee Credit" means the Customer Service Transaction Fee Credit percentage amount set forth in Section III of this Exhibit for each applicable service level standard that was not achieved, multiplied by the dollar amount of the Customer Service Transaction Fees under Section 4.1 payable in the applicable month for which the applicable service level standard applies.

- In no event will the Company be entitled to an aggregate dollar amount of Fulfillment Transaction Fee Credits or Technology Transaction Fee Credits, as the case may be, from any or all service level standards herein, in excess of 10% the Fulfillment Transaction Fee with respect to the Fulfillment Transaction Fee, 10% the Customer Service Transaction Fee with respect to the Customer Service Transaction Fee or 10% of the Technology Transaction Fee paid to the GSI during the calendar month for which the applicable service level standards apply. Additionally, in no event will any Fulfillment Transaction Fee Credits, Customer Service Transaction Fee Credits, or Technology Transaction Fee Credits be carried back or forward to any other period.

- Within five (5) Business Days after the end of each calendar month, GSI shall generate and deliver to the Company a report which sets forth the service level percentages achieved under this Exhibit and what Fulfillment Transaction Fee Credits, Customer Service Transaction Fee Credits, and Technology Transaction Fee Credits, if any, should be offset against the Fulfillment Transaction Fees, Customer Service Transaction Fees, and Technology Transaction Fees for such month. In addition, each such report shall note if the calculated percentage service level corresponded to any "*" item in which event such month shall be considered a "Service Level Standard Failed Month".

- A "Service Level Termination Event" will be deemed to have occurred upon the occurrence of (A) three (3) consecutive Service Level Standard Failed Months (which shall include at least two (2) failures of the same service level standard) or (B) any eight (8) Service Level Standard Failed Months in any consecutive 12 month period. In such event, the Company may, at its option,

29

terminate this Agreement upon sixty (60) days prior written notice to GSI; provided, however, if Company does not exercise such right of termination within ninety (90) days following the occurrence of the most recently occurring Service Level Standard Failed Month giving rise to the termination right, then Company shall be deemed to have waived such right until such time as a future Service Level Standard Failed Month causes (A) or (B) to apply.

- EXCEPT WITH RESPECT TO THE INDEMNIFICATION OBLIGATIONS SET FORTH IN SECTION 6 OF THE AGREEMENT, THE FULFILLMENT TRANSACTION FEE CREDITS, CUSTOMER SERVICE TRANSACTION FEE CREDITS, AND THE TECHNOLOGY TRANSACTION FEE CREDITS AND TERMINATION RIGHTS SET FORTH IN THIS EXHIBIT "B" ARE THE SOLE AND EXCLUSIVE LIABILITY OF GSI AND THE SOLE AND EXCLUSIVE REMEDY OF THE COMPANY FOR GSI'S FAILURE TO COMPLY WITH THE ABOVE SERVICE LEVELS.

Exhibit "C"

**Value Added Services**

- Gift packaging
- Inclusion of gift with purchase
- Inclusion of samples
- Kitting and bundling of products (if applicable)
- Polybagging of Products
- Re-polybagging Products that is returned by Customers of the Company Online Store and placed back in stock for resale
- Re-ticketing Products that is returned by Customers of the Company Online Store and placed back in stock for resale

All Value Added Services shall be performed within commercially reasonable processing times applicable to such action. In consideration of GSI providing such Value Added Services (other than for gift packaging which is as set forth in Section 3.3(d) and inclusion of inserts which is as provided in the table below), the Company shall pay to GSI (a) GSI's actual materials cost for such services, plus (b) $25 per person per hour for each hour spent providing such services. GSI may modify rates upon no less than ninety (90) days notice to the Company; provided, however, rates may only be modified one time per calendar year during the Term and no individual increase may exceed 5%.

## Exhibit "D"

### Insertion Fees

| Inserts Fees | | | | | | |
| --- | --- | --- | --- | --- | --- |
| # of Pages | 1st Insert | 2nd | 3rd | 4th | 5 or more |
| 1 Page | Free In Contract | $0.03 | $0.03 | $0.04 | $0.05 |
| 2-3 Pages | Free In Contract | $0.03 | $0.04 | $0.04 | $0.05 |
| 4-7 Pages | Free In Contract | $0.04 | $0.05 | $0.05 | $0.06 |
| 8-20 Pages | Free In Contract | $0.05 | $0.06 | $0.07 | $0.08 |
| 21-45 Pages | Free In Contract | $0.06 | $0.07 | $0.08 | $0.09 |
| 46+ Pages | Free In Contract | $0.07 | $0.08 | $0.10 | $0.11 |

## Exhibit E
### Returns Policy

We want you to be fully satisfied with every item that you purchase from BabyCenter.com. If you are not satisfied with an item that you have purchased, simply return the unused portion and we will be happy to remit your account for the full amount of the purchase. If you prefer, you may exchange all or part of your purchase for other items sold on BabyCenter.com. Please refer to our Returns / Exchange Instructions for more information.

EXECUTION COPY

FIRST AMENDMENT TO E-COMMERCE AGREEMENT

This First Amendment (this "Amendment") to the E-Commerce Services Agreement (the "Agreement"), dated as of August 18, 2006, by and between BabyCenter, L.L.C. (the "Company"), and GSI Commerce Solutions, Inc. ("GSI"), is made as of June 29, 2006. This Amendment shall be effective as of the Services Commencement Date. All capitalized terms not specifically defined herein shall have the meaning ascribed to them pursuant to the Agreement.

## RECITALS

WHEREAS, the Company and GSI entered into the Agreement pursuant to which GSI, among other things, provides certain e-commerce related services for the Company Online Store; and

WHEREAS, the Company and GSI desire to enter into this Amendment to the Agreement in order to amend certain rights and obligations of the Parties all on the terms and conditions herein.

NOW, THEREFORE, intending to be legally bound, and in consideration of the mutual obligations contained herein and in the Agreement, the Parties agree as follows:

**1.     Amendments.**

1.1     Section 4.4 is hereby amended by adding a new subsection (c) which hereby reads as follows:

"(c) For the sake of clarity, all calculations under this Section 4.4 which are based upon the number of units returned to GSI's fulfillment center during any applicable period, shall include, in addition to units returned pursuant to orders fulfilled by GSI after the Services Commencement Date, all units returned to GSI's fulfillment center related to orders fulfilled by Persons other than GSI prior to the Services Commencement Date."

1.2     Section 4.5 of the Agreement is hereby amended and restated in its entirety to read as follows:

"4.5     **Shipping Costs.** GSI will ship merchandise from the applicable GSI fulfillment center to the end Customer (i) for shipments other than to addresses in Canada, (A) on the Company's accounts with FedEx Corporation and United Parcel Service of America, and (B) on GSI's account with United States Postal Service, and, (ii) with respect to shipments to addresses in Canada, on GSI's then designated carrier account (which as of the Services Commencement Date, is Purolator Courier Ltd.). GSI will use commercially reasonable efforts to use applicable carriers designated by the Company based on weight and zone parameters among those carriers. All shipping and related costs for shipments on the Company's carrier accounts shall be billed to and paid directly by the Company and GSI shall have no liability related thereto. For all shipments on GSI's carrier accounts, the Company will pay to GSI amount equal to (i) the lowest ground (or expedited, as applicable) shipping rate quoted to GSI by United States Postal Service and GSI's designated carrier with respect to shipment to Canada for shipment from the applicable GSI fulfillment center to the end Customer ("GSI's Shipping Cost"), plus (ii) with respect to shipments to addresses in Canada, GSI's Shipping Profit Share, if any. For purposes of this Agreement, "GSI's Shipping Profit Share" means the amount if any, obtained by multiplying (a) 50%, times (b) the amount, if any, obtained by subtracting (1) GSI's Shipping Cost with respect to

shipments to addresses in Canada, from (2) the amount of shipping proceeds received by Customers in connection with Orders through the Company Online Store with respect to shipments to addresses in Canada. The amounts due GSI hereunder will be GSI Other Fee Amounts under Section 4.1(e) and will be payable to GSI as part of the Transaction Payments and processes described in Section 4.1 hereof."

1.3    The Order Status service level standard under Section I of Exhibit B is hereby amended and restated in its entirety to read as follows:

Order Status:

GSI will provide at least 98% shipped order status back to the Company through a daily report provided on or before 6:00 a.m. each day reporting order shipments occurring on or before midnight of the previous day (tracked through missed order status file logs).

- If less than 98% of shipped order status back to the Company occurs within the time required, the Company will be issued one or more Fulfillment Transaction Fee Credits (as defined below) in accordance with the table set forth below. Such credit(s) to be determined on the basis of the actual percentage of order status files received within the time required for such month as set forth in the table below.

| Actual percentage of Order Status File received within the time required | Fulfillment Transaction Fee Credit(s): |
| --- | --- |
| 98.00%+ | 0% |
| 95.00% - 97.99% | 1% |
| *92.50% - 94.99% | 2% |
| *90.00% – 92.49% | 3% |
| *87.50% – 89.99% | 4% |
| *85.00% – 87.49% | 5% |
| *Below 85.00% | 10% |

1.4    The Inventory Management service level standard under Section I of Exhibit B is hereby amended and restated in its entirety to read as follows:

Inventory Management:

- Subject to receiving at least one (1) Business Day prior notice of incoming shipments of inventory and subject to such shipments materially complying with the Merchandise Assortment Plan (which shall include forecasts related to amounts of products to be delivered to GSI and associated timing of such deliveries) then in effect and complying with the Receiving Guidelines set forth on Exhibit "A" ("Dock to Stock Eligible Inventory"), GSI will receive, unpack (to the extent necessary) and store ("dock to stock") 98% (calculated based upon Dock to Stock Eligible Inventory units received) of the Company provided inventory by the close of the 2nd Business Day after GSI first begins the systemic receiving process for such inventory.

- If less than 98% of Dock to Stock Eligible Inventory received is not received, unpacked (to the extent necessary) and stored by the close of the 2nd Business Day after GSI first begins the systemic

-2-

receiving process for such inventory the Company will be issued one or more Fulfillment Transaction Fee Credits (as defined below) in accordance with the table set forth below. Such credit(s) to be determined on the basis of the actual percentage of Dock to Stock Eligible Inventory received, unpacked and stored by GSI by the close of the 2nd Business Day after GSI first begins the systemic receiving process for such inventory for such month as set forth in the table below.

| Actual percentage of Dock to Stock Eligible Inventory received, unpacked and stored by GSI by the close of the 2nd Business Day after GSI first begins the systemic receiving process for such inventory for such month | Fulfillment Transaction Fee Credit(s): |
|---|---|
| 98.00%+ | 0% |
| 95.00% - 97.99% | 1% |
| 92.50% - 94.99% | 2% |
| 90.00% – 92.49% | 3% |
| 87.50% – 89.99% | 4% |
| 85.00% – 87.49% | 5% |
| *Below 85.00% | 10% |

The Parties acknowledge and agree that the period of time between GSI's receipt of inventory at its docks and the time GSI first begins the systemic receiving process for such inventory is not included in the above calculations. The Parties will work together in good faith and use commercially reasonable efforts to evaluate the time between GSI's receipt of inventory at its docks and the time GSI first begins the systemic receiving process to determine if it is generally within a commercially reasonable period of time. If the Parties determine that the time between GSI's receipt of inventory at its docks and the time GSI first begins the systemic receiving process is not generally within a commercially reasonable period of time, then the Parties will work together to determine a mutually agreed upon resolution that permits GSI to limit the time to generally be within a commercially reasonable period of time.

1.5     The fifth bullet point under Section IV of Exhibit B is hereby amended by replacing the words "five (5) Business Days" with "ten (10) Business Days".

2.     **Miscellaneous.**

2.1     Except as specifically amended herein, the Agreement shall remain in full force and effect in accordance with its terms.

2.2     This Amendment may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one agreement.

2.3     This Amendment will be interpreted, construed and enforced in accordance with the laws of the State of New York, without reference to its choice of law rules.

(*************)

-3-

IN WITNESS WHEREOF, intending to be legally bound, each of the Parties have caused their duly authorized representatives to enter into this Amendment on the date first written above.

GSI COMMERCE SOLUTIONS, INC.

By: _____
Name: Damon Mintzer
Title: EUP, Sales

Address:       935 First Avenue
               King of Prussia, PA  19406
Telephone:     (610) 491-7000
Facsimile:     (610) 265-1730

BABYCENTER, L.L.C.

By: _____
Name: Colleen Hancock
Title: COO

Address:       163 Freelon Street
               San Francisco, CA 94107
Telephone:     (415) 537-0900
Facsimile:     (415) 537-0909

-4-